**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**EDWARD LUTHER JACKSON,**

                **Plaintiff,**          **5:14-cv-756**
                                   **(GLS)**

        **v.**

**CAROLYN W. COLVIN,** Acting
Commissioner of Social
Security,

               **Defendant.**

_____

**APPEARANCES:**           **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Office of Peter M. Hobaica, LLC    B. BROOKS BENSON, ESQ.
2045 Genesee Street
Utica, NY 13501

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN    DANIEL R. JANES
United States Attorney          Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Edward Luther Jackson challenges the Commissioner of Social Security's denial of Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering Jackson's arguments, the Commissioner's decision is affirmed and Jackson's complaint is dismissed.

## II. Background

On January 4, 2011, Jackson filed applications for DIB and SSI under the Social Security Act ("the Act"), alleging disability since December 30, 2010. (Tr.[1] at 91-92, 161-67, 168-77.) After his applications were denied, (*id.* at 93-100), Jackson requested a hearing before an Administrative Law Judge (ALJ), (*id.* at 101), which was held on July 24, 2012, (*id.* at 38-90). On October 9, 2012, the ALJ issued an unfavorable decision denying the requested benefits, (*id.* at 17-37), which became the Commissioner's final determination upon the Social Security Administration

---

[1] Page references preceded by "Tr." are to the Administrative Transcript. (Dkt. No. 9.)

Appeals Council's denial of review, (*id.* at 1-7).

Jackson commenced the present action by filing his complaint on June 20, 2014, wherein he sought review of the Commissioner's determination.  (*See generally* Compl.)  The Commissioner filed an answer and a certified copy of the administrative transcript.  (Dkt. Nos. 8, 9.)  Each party, seeking judgment on the pleadings, filed a brief.  (Dkt. Nos. 16, 19.)

## III.  Contents

Jackson contends that the Commissioner's decision is tainted by legal error and is not supported by substantial evidence.  (Dkt. No. 16 at 12-25.)  Specifically, Jackson claims that the ALJ: (1) failed to develop the record by refusing to schedule Jackson for a consultative intelligence examination; (2) erroneously determined Jackson's residual functional capacity (RFC); (3) improperly evaluated Jackson's credibility by failing to make required findings; and (4) erred at step five by failing to consult a vocational expert (VE).  (*Id.*)  The Commissioner counters that the appropriate legal standards were used by the ALJ and his decision is also supported by substantial evidence.  (Dkt. No. 19 at 2-16.)

## IV.  Facts

The court adopts the parties' undisputed factual recitations.  (Dkt.

No. 16 at 1-12; Dkt. No. 19 at 1.)

## V.  Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[2] is well established and will not be repeated here.  For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

## VI.  Discussion

### A.    Development of the Record and Listing 12.05(C)

Jackson first argues that the ALJ failed to develop the record when he refused to schedule a consultative intelligence evaluation.  (Dkt. No. 16 at 12-15.)  More specifically, Jackson contends that the failure to order an intelligence evaluation compromised the ALJ's step three determination, because the test could have led to a finding that Jackson was disabled under Listing 12.05(C).  (*Id.*)  The Commissioner counters that an

---

[2] Review under 42 U.S.C. §§ 405(g) and 1383(c)(3) is identical.  As such, parallel citations to the regulations governing SSI are omitted.

intelligence examination was not warranted because IQ scores had already been submitted to the ALJ, and they did not fall within the range required by Listing 12.05(C).  (Dkt. No. 19 at 5-7.)  The Commissioner further argues that, even if Jackson had a qualifying IQ score, he does not meet Listing 12.05(C) because he failed to show that he has deficits in adaptive functioning which manifested prior to age twenty-two.  (*Id.*)  The court agrees with the Commissioner.

While the ALJ has an affirmative obligation to develop the administrative record, his duty to do so is not without limit.  *See Guile v. Barnhart*, No. 5:07-cv-259, 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010).  Indeed, if all of the evidence received is consistent and sufficient to determine whether a claimant is disabled, further development of the record is unnecessary, and the ALJ may make his determination based upon that evidence.  *See* 20 C.F.R. § 404.1520b(a).  Consistent with that notion, where there are no "obvious gaps" in the record, the ALJ is not required to seek additional information.  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).  The regulations provide that a consultative examination may be warranted "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to . . . make a determination or

decision on [a] claim." 20 C.F.R. § 404.1519a(b).

At step three of the disability analysis, the ALJ must determine if a claimant suffers from a listed impairment. *See id.* § 404.1520(a)(4)(iii). It is the burden of the plaintiff to establish that his medical conditions meet all of the specific medical criteria of a particular listed impairment. *See Pratt v. Astrue*, No. 7:06-CV-551, 2008 WL 2594430, at *6 (N.D.N.Y. June 27, 2008) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Listing 12.05 is entitled "Intellectual disability." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05. In order to meet the requirements of Listing 12.05(C)—the Listing at issue here—a claimant must show "(1) below average intellectual function with adaptive functioning deficits manifested before age [twenty-two] and continuing during the claim period, (2) a valid IQ score of [sixty] through [seventy], and (3) an impairment, other than [his] low IQ, that imposes an additional and significant work-related limitation of functioning." *Lyons v. Colvin*, No. 7:13-CV-00614, 2014 WL 4826789, at *6 (N.D.N.Y. Sept. 29, 2014) (internal quotation marks and citations omitted).

Here, Jackson claims that the ALJ failed to fully develop the record when he refused to order a consultative intelligence evaluation because there was evidence in the record that suggested that he might meet Listing

6

12.05(C).  (Dkt. No. 16 at 12-15.)  The evidence that Jackson points to are two IQ scores of eighty-seven and seventy-two, which were obtained when he was in the sixth and tenth grade, respectively.  (*Id.*; Tr. at 256.)  Given those low scores, Jackson argues, the ALJ should have scheduled additional testing so that Jackson could be "fully evaluated."  (Dkt. No. 16 at 12-15; Tr. at 41-42.)  Without a recent IQ score, Jackson claims that the ALJ could not properly assess whether he met the requirements for Listing 12.05(C).  (Dkt. No. 16 at 12-15.)  The court disagrees.

As an initial matter, the court notes that the ALJ's decision is devoid of any mention of Listing 12.05(C).  This omission troubles the court more than the ALJ's failure to schedule an intelligence test.  Conversations between the ALJ and Jackson's counsel during the hearing, however, may shed light on why the ALJ omitted a specific discussion of Listing 12.05(C). In that conversation, the ALJ stated that he was unlikely to schedule a cognitive examination because he did not believe that this was a case "that could potentially be evaluated under 12.05C, because the scores have to be below a certain level," which they were not.  (Tr. at 42.)  Nevertheless, the ALJ stated that he would specifically question Jackson on his reading and writing abilities, and make a decision at the end of the hearing as to

whether an intelligence test was necessary.  (*Id.*)  After extensively

questioning Jackson on his reading, writing, and quantitative abilities, in

addition to his activities of daily living and social habits, the ALJ found

additional testing to be unwarranted.  (*Id.* at 88.)  Specifically, the ALJ

stated that he was "not going to find that [Jackson] has mental retardation,"

because Jackson is "at least functioning at the . . . borderline level," but he

also stated that he would "certainly . . . take [Jackson's cognitive

limitations] into consideration" and not "disregard" them.  (*Id.* at 88-89.)

Given what transpired at the hearing and the ALJ's own assurances,

it would have been prudent for the ALJ to thoroughly discuss Listing

12.05(C) in his decision, more clearly explain why a consultative

intelligence examination was unnecessary, and specifically outline why

Jackson does not meet the Listing 12.05(C) requirements.  For three

primary reasons, however, the court is not persuaded that the ALJ's failure

to do so constitutes reversible error.  First, there is some evidence in the

ALJ's decision that indicates that he considered the Listing 12.05(C)

requirements after the hearing, such as his reference to Jackson's

education records and Jackson's history of special education classes.  (*Id.*

at 23); *see Clark v. Colvin*, No. 6:12-CV-1507, 2013 WL 6795627, at *10

(N.D.N.Y. Dec. 18, 2013) (noting that the ALJ's failure to mention Listing 12.05(C) by its number was harmless error where the court could glean from the ALJ's decision that he considered the Listing 12.05(C) requirements).

Second, the ALJ had before him valid IQ scores, none of which fell within the sixty to seventy range that is required to meet Listing 12.05(C). (Tr. at 256.)  Indeed, both scores before the ALJ were above seventy, (*id.*) and, although they were obtained while Jackson was in high school, in this Circuit, "in the absence of evidence indicating otherwise, . . . claimants will experience a fairly constant IQ throughout [their] li[ves]." *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012) (internal quotation marks and citation omitted).  Thus, in light of the scores already available to the ALJ, Jackson failed to meet one of the requirements of Listing 12.05(C), and it was not legal error for the ALJ to conclude that additional testing was unnecessary.

Third, as noted above, even if Jackson did have a qualifying score, he would also need to demonstrate deficits in adaptive functioning that initially manifested before he reached the age of twenty-two.  *See id.* at 153*;* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.  The court is not satisfied

that Jackson has met his burden. Indeed, even in his memorandum of law, Jackson ignores this requirement altogether. (Dkt. No. 16 at 12-15.) "Adaptive functioning refers to an individual's [ ]ability to cope with the challenges of ordinary everyday life," and "courts have held that if one is able to satisfactorily navigate activities such as liv[ing] on [one's] own, . . . pay[ing] bills, and avoid [ing] eviction, one does not suffer from deficits in adaptive functioning." *Talavera*, 697 F.3d at 153 (internal quotation marks and citations omitted). Throughout the hearing, Jackson testified that he graduated from high school, albeit with the accommodation of special education classes,[3] can read a newspaper article on occasion, can write simple notes, do basic math, and, at one period of time, was able to maintain his finances, but now shares household responsibilities with his girlfriend. (Tr. at 46-50.) He also testified that he is able to perform some household tasks, such as mow the lawn and make repairs, and, for recreation, he visits his grandchildren. (*Id.* at 68-70, 72.) Moreover, as the ALJ noted, the psychiatric review technique form completed by Dr. C.

---

[3] The court notes that the record is unclear with respect to whether Jackson actually was part of a special education program. The ALJ notes that his education records do not indicate that he was, (Tr. at 23), and Dr. C. Butensky, the State Agency review psychologist, also noted that "the Fulton City School District indicated that [Jackson] was not a sp[ecial] ed[ucation] student," (*id.* at 301).

Butensky, the state agency review psychologist, on March 23, 2011, concludes that Jackson has no restrictions in activities of daily living, social functioning, maintaining his concentration, persistence, or pace, and no repeated episodes of decompensation, and, therefore, that Jackson did not have a medically determinable mental impairment. (*Id.* at 289-301.) Under these circumstances, there is substantial evidence to support a conclusion that, even if the ALJ erred in failing to develop the record, it was harmless, as Jackson has not demonstrated that he has deficits in adaptive functioning.

## B. RFC Determination

Next, Jackson argues that the ALJ's RFC determination is unsupported by substantial evidence and tainted by legal error because he improperly gave only some weight, and not controlling weight, to Jackson's treating physician, and because he both failed to set forth specific findings supporting his opinion that Jackson is capable of performing a full range of light work, and improperly substituted his own opinion that Jackson possessed the RFC for light work. (Dkt. No. 16 at 15-22, 24-25.) The Commissioner counters, and the court agrees, that the ALJ's RFC determination is both free of legal error and supported by substantial

evidence.  (Dkt. No. 19 at 7-14.)

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain.  *Id.* § 404.1545(a)(3).  An ALJ's RFC determination must be supported by substantial evidence[4] in the record.  *See* 42 U.S.C. § 405(g).  If it is, that determination is conclusive and must be affirmed upon judicial review.  *See id.*; *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

Here, the ALJ found that, in the course of an eight-hour workday, Jackson has the RFC "to lift and/or carry [twenty] pounds occasionally; lift and/or carry [ten] pounds frequently; stand and/or walk for a total of six hours; and sit for a total of six hours."  (Tr. at 27-31.)  The ALJ further found that Jackson "retains the ability to communicate adequately with supervisors, co-workers, and the public."  (*Id.*)  Accordingly, the ALJ concluded that Jackson possessed the RFC to perform the full range of light work.  (*Id.* at 31-32.)

---

[4] "Substantial evidence is defined as more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal quotation marks and citations omitted).

*1.    Evaluation of Record Medical Evidence*

First, Jackson argues that the RFC determination is flawed because the ALJ erred in giving only some weight, rather than controlling weight, to his treating physician, Dr. Sarah Shirazi.  (Dkt. No. 16 at 15-20.)  The court disagrees.

Medical opinions, regardless of the source, are evaluated by considering several factors outlined in 20 C.F.R. § 404.1527(c). Controlling weight will be given to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Id.* § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Unless controlling weight is given to a treating source's opinion, the ALJ is required to consider the following factors in determining the weight assigned to a medical opinion: whether or not the source examined the claimant; the existence, length and nature of a treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner.  *See* 20 C.F.R. § 404.1527(c).  "Nevertheless, where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," it is not necessary that

the ALJ "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (internal quotation marks and citation omitted).

Here, the ALJ gave "[s]ome weight" to Dr. Shirazi's medical source statement, but only "to the extent [that she] determined that [Jackson] could lift up to [ten] pounds frequently and up to [twenty] pounds occasionally, and could carry up to [ten] pounds frequently and up to [twenty] pounds occasionally," despite the severe impairments caused by his degenerative joint disease of the lumbar spine.  (Tr. at 23, 30, 324-30.) The ALJ also gave some weight to Dr. Shirazi's determination that Jackson "retain[s] the ability to hear and understand simple oral instructions and to communicate simple information," and is able to "use a telephone to communicate," despite his hearing loss.  (*Id.*)  However, the ALJ found no support in the record medical evidence for Dr. Shirazi's conclusion that Jackson "cannot stand and walk at the light level of exertion, cannot sit at even a sedentary level of exertion, and requires the use of a cane to ambulate."  (*Id.* at 30, 326.)  The ALJ found Dr. Shirazi's latter conclusions

to be "completely subjective, unsupported by any treatment notes or reports . . ., and devoid of any clinical or diagnostic findings" because "[t]here is nothing in the medical evidence of record . . . to suggest that Dr. Shirazi has ever treated or examined [Jackson]," and, at the hearing, Jackson himself "admitted that he only needed to use a cane on an occasional basis." (*Id.* at 30-31.) The ALJ also gave "some weight" to the consultative internal medicine examination performed by Dr. Joseph Prezio, in which Dr. Prezio opined that Jackson had no significant physical restrictions or limitations, but the ALJ ultimately concluded that Jackson "does have some mild physical limitations," and limited him to a light level of exertion. (*Id.* at 30, 278.)

The ALJ properly weighed the medical evidence of record. As an initial matter, the court is not convinced that Dr. Shirazi actually qualifies as a treating physician. Although Jackson submitted to the Appeals Council[5] a two-page office note, which demonstrates that Dr. Shirazi examined

_____

[5] After Jackson submitted this treatment note, which is dated August 13, 2012, to the Appeals Council, the Appeals Council erroneously concluded that it pertains to the period of time following the ALJ's decision, which was rendered on October 10, 2012. (Dkt. No. 16, Attach. 2.) Thus, Jackson alternatively seeks remand on the ground that this treatment note constitutes new evidence. (*Id.*) Jackson's request is denied. Despite the Appeals Council's obvious error, as further discussed below, this "new evidence" does little, if anything, to bolster Jackson's argument that the ALJ improperly weighed the record medical evidence.

Jackson on one occasion prior to the ALJ's decision—the same day that she completed her medical source statement—one examination is insufficient to render Dr. Shirazi a treating physician. (Dkt. No. 16, Attach. 3.) A treating source is defined as a claimant's own "physician, psychologist, or other acceptable medical source" who has provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. "The opinion of a treating physician is accorded extra weight because the continuity of treatment [s]he provides and the doctor/patient relationship [s]he develops place [her] in a unique position to make a complete and accurate diagnosis of h[er] patient." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983). Courts in this Circuit have found that "[d]octors who see a patient only once do not have a chance to develop an ongoing relationship with the patient, and therefore are not generally considered treating physicians." *Shatraw v. Astrue*, No. 7:04-CV-0510, 2008 WL 4517811, at *10 (N.D.N.Y. Sept. 30, 2008) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *see Mongeur*, 722 F.2d at 1039 n.2.

Further, even if Dr. Shirazi were to be considered a treating physician, the ALJ properly afforded her opinion less than controlling

16

weight, as it was inconsistent with the record evidence.  First, Jackson's

own testimony and statements undermine the restrictive limitations in Dr.

Shirazi's medical source statement.  For example, Jackson testified at the

hearing that he only uses a cane occasionally and is capable of mowing

the lawn.  (Tr. at 68-69, 83.)  Further, during his medical examination with

Dr. Prezio, Jackson stated that, despite his lower back pain, he is able to

cook, clean, do laundry, shop, and generally care for his personal needs.

(*Id.* at 276.)  These statements are more consistent with Dr. Prezio's

findings that Jackson exhibited a normal gait, and had a full range of

motion in his spine, shoulders, elbows, forearms, wrists, hips, knees, and

ankles.  (*Id.* at 277-78.)  Accordingly, the weight afforded to the various

opinions by the ALJ, for reasons which are fully articulated in his written

decision, is free of legal error and supported by substantial evidence.  (*Id.*

at 30-31.)

    *2.    Light Work*

Jackson also claims that the ALJ's determination that Jackson

possessed the RFC to perform the full range of light work was erroneous

because the ALJ "fail[ed] to set forth specific findings supporting his

opinion," and "improperly substitut[ed] his own opinion" to support his

conclusion, which was otherwise not supported by the medical evidence in the record. (Dkt. No. 16 at 21-22, 24-25.) Again, the court disagrees.

Under the regulations, light work "involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds." 20 C.F.R. § 404.1567(b). Light work also may "require[] a good deal of walking or standing," or it may involve "sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.* Further, "the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday." SSR 83-10, 1983 WL 31251, at *6 (1983).

Turning to Jackson's first argument, contrary to his assertion that the ALJ "did not estimate specifically any amounts of time that [Jackson] could sit, stand, walk or perform work activities," (Dkt. No. 16 at 22), the ALJ found that "[t]hroughout the course of an eight-hour workday, [Jackson] has the capability to lift and/or carry [twenty] pounds occasionally, lift and/or carry [ten] pounds frequently, stand and/or walk for a total of six hours, and sit for a total of six hours." (Tr. at 31.) Accordingly, Jackson's

18

argument is summarily rejected.

Further, these specific findings are supported by the medical evidence, and not, as Jackson contends, based on the ALJ's "own opinion." (Dkt. No. 16 at 24.) As discussed above, the ALJ based these findings, in part, on Dr. Shirazi's medical source statement and Dr. Prezio's consultative internal medicine examination, both of which support a conclusion that Jackson is capable of performing light work. (Tr. at 30-31.) Other medical evidence in the record also supports these findings. For example, the ALJ noted that April 2010 x-rays of Jackson's lumbar spine were negative, (*id.* at 27, 275), and, despite complaining about moderate low back pain from 2010 to 2012 and having some positive tests, there was no evidence to suggest that he consistently sought medical treatment for his pain, (*id.* at 27-28). The ALJ also thoroughly discussed Jackson's nonexertional limitations—namely, his hearing loss. (*Id.* at 32.) Indeed, the ALJ examined the extent to which the light work occupational base might be eroded by his limitations, and, relying on Jackson's hearing testimony and Dr. Shirazi's medical source statement, ultimately concluded that Jackson "continues to possess the abilit[ies] to hear and understand simple oral instructions, . . . communicate simple information, and . ..

function[] both with and without a hearing aid." (*Id.* at 32, 328.)

Accordingly, the ALJ's RFC determination is free of legal error and supported by substantial evidence.

## C.   Credibility Determination

Next, Jackson vaguely and curtly claims that the ALJ "erred in failing to set forth required findings to substantiate his rejection of [Jackson]'s testimony as to pain and limitations as not credible," but completely fails to explain in what way the ALJ's credibility determination was insufficient. (Dkt. No. 16 at 22-23.)  The court agrees with the Commissioner, (Dkt. No. 19 at 14-15), that the ALJ's credibility determination was not patently unreasonable.

"Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010). To that end, once the ALJ determines that the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce the [symptoms] alleged," he "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not

substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Id.* (internal quotation marks and citations omitted). In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements." SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2, 1996). Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *F.S. v. Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).

Here, the ALJ found that Jackson's medically determinable impairments could reasonably be expected to cause the symptoms alleged, but that Jackson's "statements concerning the intensity, persistence, and limiting effects of his symptoms are not fully credible." (Tr. at 28-29.) In making his determination, the ALJ first noted that Jackson's allegations of disabling symptomology were undermined by the infrequency with which he sought medical attention, the nonaggressive

treatment he was afforded, (*id.* at 29, 313-23), and the unremarkable clinical findings of Dr. Prezio, (*id.* at 29, 276-80). Additionally, Jackson's own statements regarding his "wide range of independent daily activities" further compromised his credibility, as he claimed to be able to mow the lawn, attend to all personal care independently, occasionally take walks, travel, prepare meals, help with laundry and cleaning, grocery shop, perform minimal house repairs, and visit with his grandchildren. (*Id.* at 29, 68-72, 209-12, 276.)

Although the ALJ did not undertake a step-by-step exposition of the factors articulated in 20 C.F.R. § 404.1529(c), "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record." *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted); *see Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (stating that the 20 C.F.R. § 404.1529(c)(3) factors are included as "'examples of alternative evidence that may be useful [to the credibility inquiry], and not as a rigid, seven-step prerequisite to the ALJ's

finding'" (quoting *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 546 (S.D.N.Y. 2004))).  Accordingly, taken as a whole, the ALJ's credibility determination is not "patently unreasonable," and the court declines to remand on that basis.  *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." (internal quotation marks and citation omitted)).

**D.**    **Step Five Determination**

Finally, relying primarily on arguments regarding the ALJ's inadequate RFC determination, Jackson contends that the ALJ erred at step five when he failed to seek the opinion of a VE.  (Dkt. No. 16 at 20-21.)  Jackson is incorrect.

In making his ultimate disability determination, the ALJ must consider whether the claimant can do any other, less demanding work existing in the national economy.  *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c); *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990).  To make such a determination, an ALJ may rely on the Medical-Vocational Guidelines, referred to as "the grids," found in 20 C.F.R. pt. 404, subpt. P, app. 2, as long as the claimant's age, education, work experience, and

RFC coincide with the criteria of a rule contained in those Guidelines. *See* 20 C.F.R. § 404.1569; *see also Calabrese v. Astrue*, 358 F. App'x 274, 275 n.1 (2d Cir. 2009). However, "if a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations' then the grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (quoting *Blacknall v. Heckler*, 721 F.2d 1179, 1181 (9th Cir. 1983)). In that case, the ALJ should consult with a VE before making a determination as to disability. *See id.*

Here, as discussed above, the ALJ properly determined that Jackson retains the physical RFC to "lift and/or carry [twenty] pounds occasionally; lift and/or carry [ten] pounds frequently; stand and/or walk for a total of six hours; and sit for a total of six hours," and also "retains the ability to communicate adequately with supervisors, co-workers, and the public." (Tr. at 27-31); *see supra* Part VI.B. In determining whether Jackson could perform the full range of light work, the ALJ considered Jackson's age, education, work experience, and RFC, along with his nonexertional limitation—hearing loss—which, the ALJ found, "does not appreciably

affect the potential unskilled light work occupational base." (*Id.* at 31-32.)

Thus, the ALJ concluded that, under the Guidelines, Jackson is not

disabled. (*Id.*) Accordingly, because the ALJ's RFC determination was

supported by substantial evidence, and Jackson's nonexertional limitations

do not "significantly limit the range of work permitted by his exertional

limitations," consultation with a VE was not required by the regulations.

*Bapp*, 802 F.2d at 605-06 (internal quotation marks and citation omitted).

### E.      Remaining Findings and Conclusions

After careful review of the record, the court affirms the remainder of

the ALJ's decision as it correctly applies the relevant legal standards and is

supported by substantial evidence.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and

Jackson's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

August 20, 2015
Albany, New York

Gary L. Sharpe
Gary L. Sharpe
Chief Judge
U.S. District Court